## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| JAMIE GREENWOOD, Individually and on Behalf of All Others Similarly Situated, | Case No.: 21-cv-2459 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| vs. | |
| COTTONWOOD FINANCIAL LTD, COTTONWOOD FINANCIAL WISCONSIN LLC, COTTONWOOD FINANCIAL ARIZONA, LLC COTTONWOOD FINANCIAL AUSTIN CSO, LLC, COTTONWOOD FINANCIAL COLORADO, LLC, COTTONWOOD FINANCIAL IDAHO, LLC, COTTONWOOD FINANCIAL ILLINOIS, LLC, COTTONWOOD FINANCIAL KANSAS, LLC, COTTONWOOD FINANCIAL MICHIGAN, LLC, COTTONWOOD FINANCIAL MISSOURI, LLC, CF NEW MEXICO, LLC, COTTONWOOD FINANCIAL OHIO, LLC, COTTONWOOD FINANCIAL OKLAHOMA, LLC, COTTONWOOD FINANCIAL TEXAS, LLC, COTTONWOOD FINANCIAL UTAH, LLC, COTTONWOOD FINANCIAL VIRGINIA, LLC and COTTONWOOD FINANCIAL WASHINGTON, LLC, | **Jury Trial Demanded** |
| Defendants. | |

## <u>INTRODUCTION</u>

1.      This class action seeks redress for unfair consumer lending and collection practices that violate the Military Lending Act, 10 U.S.C. § 987 *et seq*. (the "MLA"), and the Wisconsin Consumer Act, Chs. 421-427, Wis. Stats (the "WCA").

2.      Recognizing that "predatory lending practices are prevalent and target military personnel," and that high-cost consumer loans "undermine military readiness," "harm the morale of troops and their families," and "add to the cost of fielding an all-volunteer fighting force," Congress enacted the MLA to pass various protections against predatory lending to Service

members.   Among the protections that the MLA secures are caps on high-interest loans, prohibiting creditors from extending credit to active-duty military borrowers at an annual percentage rate greater than 36%.   Disregarding these protections, the lender Defendants extended and sought to collect a *520.00%* interest loan from Plaintiff, a covered borrower under the MLA.   Further, in filing a small claims collection action against Plaintiff, Defendants concealed evidence that Plaintiff was a member of the military from the state court, presumably to avoid judicial oversight of their unscrupulous lending practices.   This Class Action seeks equitable relief and damages on behalf of Plaintiff and all others similarly situated.

## JURISDICTION AND VENUE

3.     The court has jurisdiction to grant the relief sought by the Plaintiff pursuant to 10 U.S.C. § 987, 50 U.S.C. § 4042, and 28 U.S.C. §§ 1331, 1337, and 1367.  Venue in this District is proper in that Defendants are physically located in this District.

## PARTIES

4.     Plaintiff Sergeant First Class Jamie Greenwood ("Greenwood") is an individual who resides in the Racine County, Wisconsin.

5.     Greenwood is a "covered member" and "covered borrower" as defined in the MLA in that Greenwood obtained a loan while a member of the uniformed services on active duty under a call or order that does not specify a period of 30 days or less or while on active Guard and Reserve Duty.

6.     Greenwood is also a "consumer" as defined in the FDCPA, 15 U.S.C. § 1692a, and a "customer" as defined in the WCA, Wis. Stat. § 421.301, in that she sought credit for personal, family, or household purposes.

7.     Defendant Cottonwood Financial, Ltd. ("Cottonwood Financial") is a limited partnership with its principal offices located at 1901 Gateway Drive Suite 200, Irving, Texas 75038.

8.     Cottonwood Financial is one of the largest privately-held retail consumer finance companies in the consumer finance industry, operating across the country and with more than 300 company-owned locations operating under Cottonwood Financial's "Cash Store" brand, including in Wisconsin.

9.     Cottonwood Financial operates a number of subsidiaries in several states, including:

Cottonwood Financial Arizona, LLC ("CF-AZ");

Cottonwood Financial Austin CSO ("CF-ACSO")

Cottonwood Financial Colorado, LLC ("CF-CO");

Cottonwood Financial Idaho, LLC ("CF-ID");

Cottonwood Financial Illinois, LLC ("CF-IL");

Cottonwood Financial Kansas, LLC ("CF-KS");

Cottonwood Financial Michigan, LLC ("CF-MI");

Cottonwood Financial Missouri, LLC ("CF-MO");

CF New Mexico, LLC ("CF-NM");

Cottonwood Financial Ohio, LLC ("CF-OH");

Cottonwood Financial Oklahoma, LLC ("CF-OK");

Cottonwood Financial Texas, LLC ("CF-TX");

Cottonwood Financial Utah, LLC ("CF-UT");

Cottonwood Financial Virginia, LLC ("CF-VA");

Cottonwood Financial Washington, LLC ("CF-WA"); and

Cottonwood Financial Wisconsin, LLC ("CF-WI");

("CF-[State/City]," e.g. "CF-AZ," and collectively the "CF Subsidiaries").

10.    Upon information and belief, the principal place of business for each of the CF Subsidiaries is Cottonwood Financial's corporate headquarters, 1901 Gateway Drive Suite 200, Irving, Texas 75038.

11.    For example, the Certificate Amending Application for Certificate of Authority to Transact Business in Michigan that Cottonwood Financial and Cottonwood Financial Michigan LLC ("CF-MI") filed with the Bureau of Commercial Services in the Michigan Department of Labor & Economic Growth on or about August 1, 2005 identifies CF-MI's principal place of business as 1901 Gateway Drive, Suite 200, Irving, Texas 75038.    Likewise, Defendant Cottonwood Financial Wisconsin, LLC ("CF-WI") is a limited liability company with its principal offices located at 1901 Gateway Drive Suite 200, Irving, Texas 75038.

12.    Because each CF Subsidiary has its principal place of business located at Cottonwood Financial's corporate headquarters in Irving, Texas, the CF Subsidiaries are "at home" in the State of Texas.

13.    Moreover, any CF Subsidiary whose "principal place of business" is not in Texas nonetheless has substantial and pervasive contacts with Texas.    These contacts with Texas are not isolated or casual.    Each CF Subsidiary is organized as a subsidiary corporation to a parent company that is based in Texas and that does its business in the State of Texas, and, upon information and belief, revenue from the CF Subsidiaries is distributed upward to Cottonwood Financial.

14.     Upon information and belief, Cottonwood Financial sets certain nationwide policies relating to consumer loan eligibility, approval, and enforcement, which the CF Subsidiaries located throughout the United States follow.

15.     Upon information and belief, each of the CF Subsidiaries was organized as a subsidiary of Cottonwood Financial for the express purpose of issuing loans to consumers in the particular CF Subsidiary's state and collecting the receivables associated with those loans, with some, if not all, of the revenue obtained by each CF Subsidiary distributed upward to Cottonwood Financial and/or its affiliated holding companies, and ultimately to the principal stakeholders in Cottonwood Financial and/or its affiliated holding companies.

16.     Further, Cottonwood Financial and each of the CF Subsidiaries were at all times relevant to this Action, affiliated entities acting in concert.  They are referred to collectively as "Cottonwood."

17.     Operating under the "Cash Store" brand, Cottonwood has obtained numerous licenses in states located throughout the United States, issuing high-interest loans to consumers in the states where Cottonwood operates.

18.     Cottonwood Financial and each of the CF Subsidiaries are "creditors" as defined in the MLA, 10 U.S.C. § 987(i) and 32 C.F.R. § 232.3(i), in that they are together as affiliates engaged in the business of extending consumer credit.

19.     Cottonwood Financial and CF-WI are both "creditors" as defined in the MLA, 10 U.S.C. § 987(i) and 32 C.F.R. § 232.3(i), and the WCA, Wis. Stat. § 421.301, in that they are together as affiliates engaged in the business of extending consumer credit to consumers in the State of Wisconsin.

## FACTS

20.     On or about January 4, 2021, Cottonwood filed a small claims collection complaint against Greenwood in Wisconsin Circuit Court, Racine County, styled *Cottonwood Financial WI LLC v. Jamie L. Greenwood*, Case No. 2021sc0041 (Racine Cnty., Wis. Sm. Cl. Ct.). (the "Small Claims Collection Action"). A copy of the Summons and Complaint filed in the Small Claims Collection Action is attached to this Complaint as Exhibit A.  The Small Claims Collection Action was dismissed by stipulation with prejudice as to any claims that were or may have been asserted on behalf of CF-WI and without prejudice as to any claims that were or may have been asserted on behalf of Greenwood.

21.     The Small Claims Collection Action sought recovery of an alleged consumer loan between Greenwood and CF-WI dated on or about February 21, 2020.  A copy of the Consumer Installment Loan Agreement between Greenwood and CF-WI (the "Loan Agreement") is incorporated into Exhibit A.

22.     At all times relevant to the events described in this action and the Small Claims Collection Action, Greenwood was a member of the U.S. Army National Guard.

23.     Greenwood's military status at all times relevant to this action and the Small Claims Collection Action was "Active Guard and Reserve" ("AGR").

24.     Under Greenwood's orders in effect on February 21, 2020 (the date the loan was originated), Greenwood was serving full-time as a military recruiter for the Army National Guard.  Her rank was Sergeant First Class, which had been her rank since 2013.  Greenwood's orders that were in effect on February 21, 2020 were issued on July 2, 2019.  10 U.S.C. § 101(d)(6) specifically defines "active Guard and Reserve duty" to include "organizing, administering, recruiting, instructing, or training the reserve components."

25.     As of April 14, 2021, Greenwood's military status became part-time with the Army National Guard.

26.     Cottonwood had actual or constructive knowledge that Plaintiff was on active duty when the loan was originated and throughout the period when the Small Claims Collection Action was filed because Plaintiff provided undisputed evidence of her military status, which was, upon information and belief, in Cottonwood's possession, custody, and control throughout the pendency of the loan.

27.     At the time she applied for the loan, Greenwood provided Cottonwood with information that would make any reasonable lender realize that Greenwood was an active-duty member of the uniformed armed services for purposes of the MLA.

28.     Greenwood obtained the loan at the Cash Store "brick and mortar" location at 5630 Washington Avenue, Suite 9, Racine, Wisconsin 53406.

29.     Greenwood visited the Cash Store location in person on February 21, 2020.

30.     At the Cash Store, Greenwood stood at the counter and spoke with a Cottonwood employee about obtaining a loan.

31.     The Cottonwood employee filled out a loan application for Greenwood by entering information on her computer.

32.     At the Cash Store, Greenwood told the employee that Greenwood was currently on active Guard and Reserve ("AGR") duty in the Army National Guard.

33.     The employee acknowledged Greenwood's statement as showing that Greenwood had adequate income.  The employee did not express any concerns about Greenwood's military status or any effect on the loan for which Greenwood was applying, and did not mention the MLA.

34.    The whole process to get approved and receive a check took about 30 minutes.  At no point did any Cottonwood employee indicate to Greenwood that her military status was an impediment or otherwise relevant to being approved for the particular loan Greenwood received.

35.    Cottonwood also had documentary evidence in its possession that Greenwood was a servicemember, and a "covered member" and "covered borrower," both at the time Cottonwood originated the loan and when Cottonwood filed the Small Claims Collection Action.

36.    During the pendency of the Small Claims Collection Action, Defendants produced certain documents, including many of the documents that Greenwood provided at the time she submitted her loan application.  Upon information and belief, all of this information was available to Defendants at the time the loan was originated and when the Small Claims Collection Action was filed.

37.    Several of the documents Greenwood submitted to Cottonwood at the time she first applied for a loan from Cottonwood unequivocally indicate that Greenwood was a uniformed servicemember on active duty or active Guard and Reserve duty when the loan was issued on February 21, 2020.

38.    A copy of Plaintiff's "New Customer Checklist" and "Customer Information Sheet," part of the loan application and origination documents produced in discovery during the Small Claims Collection Action, is attached to this complaint as Exhibit C.

39.    When Greenwood applied for the loan, the Cottonwood employee at the counter filled out the "New Customer Checklist" and "Customer Information Sheet" while Greenwood was at the Cash Store.

40.    When Greenwood applied for the loan, Greenwood did not know that the Military Lending Act existed, or that her AGR status imposed different obligations and rules on lenders such as Cottonwood.

41.    The Customer Information Sheet reproduced in <u>Exhibit C</u> has a signature dated February 21, 2020 and was in the possession, custody, and control of Cottonwood when the loan was issued and when the Small Claims Collection Action was filed.

42.    The Customer Information Sheet states that Plaintiff's "employer" is "Defense Fiance [sic] and Accounting," with an address of 3076 Village Drive, Plover, WI 54467, and that her "position" is "RECRUITER."

43.    The "Defense Finance and Accounting Service" ("DFAS") is the government agency responsible for paying members of the military. *See* https://www.dfas.mil/pressroom/aboutdfas/.

44.    Upon information and belief, the vast majority of, if not all, active duty and AGR servicemembers receive their pay through DFAS.

45.    As a member of the Army National Guard, Greenwood receives her pay through DFAS, but Greenwood does not "work for" DFAS.  On February 21, 2020 Greenwood worked for the United States Army National Guard, Recruiting and Retention Battalion, 1420 Wright St., Madison, Wisconsin 54703, as a recruiter.  Her duty station was the Military Recruiting office in the Kenosha National Guard Armory, 4200 43rd Ave, Kenosha, WI 53144.

46.    Greenwood's application also lists her position as "recruiter."

47.    As DFAS is not an agency concerned with recruiting, and Greenwood cannot be the only servicemember to seek a loan from Cottonwood, Defendants knew or should have known that Greenwood works for the Army National Guard, not DFAS, and that DFAS is the

processor for Greenwood's military pay rather than her employer. Indeed, as detailed below, Cottonwood used Plaintiff's DFAS "Military Leave and Earnings Statement" (the "Military LES") to verify Plaintiff's income, which expressly states that it is a "Military" LES rather than a "Civilian" LES.

48.    As part of Greenwood's loan application, Greenwood also provided a copy of her January 2020 checking account statement from Landmark Credit Union (hereinafter, "Landmark" for the Credit Union; the "Landmark Statement" for the checking account statement).

49.    Defendants produced the Landmark Statement, which is attached to this complaint as Exhibit D, in discovery in the Small Claims Collection Action.

50.    The New Customer Checklist in Exhibit C confirms that the Landmark Statement reproduced in Exhibit D was provided to and reviewed by Cottonwood on or about February 21, 2020, and was in the possession, custody, and control of Cottonwood when the loan was issued and the Small Claims Collection Action was filed.

51.    The Landmark Statement expressly links Plaintiff's electronic funds transfer earnings income from "DFAS" on January 15, 2020 and January 31, 2020 to her status as an "ACTIVE" member of the Army:

JAN15    EFT ARMY ACTIVE    DFAS-IN IND, INARMY ACT 200115

[***]

JAN31    EFT ARMY ACTIVE    DFAS-IN IND, INARMY ACT 200131

52.    Upon information and belief, "ARMY ACTIVE" means that Plaintiff received the pay while on active duty or AGR duty.

53.    At the Cash Store, Greenwood also provided her DFAS Military LES (DFAS Form 702) covering February 2020.  The Military LES is analogous to a paystub.

54.    A copy of Greenwood's Military LES, part of the loan application and origination documents produced in discovery during the Small Claims Collection Action, is attached to this complaint as Exhibit E.

55.    The New Customer Checklist in Exhibit C confirms that the Military LES reproduced in Exhibit E was provided to and reviewed by Cottonwood on or about February 21, 2020, and was in Cottonwood's possession, custody, and control when the loan was originated and the Small Claims Collection Action was filed.

56.     The Military LES reproduced in Exhibit E identifies itself as a "MILITARY LEAVE AND EARNINGS STATEMENT" rather than a "CIVILIAN LEAVE AND EARNINGS STATEMENT" as DFAS uses for civilian employees of the Department of Defense.

*Compare* Exhibit E:

DEFENSE FINANCE AND ACCOUNTING SERVICE MILITARY LEAVE AND EARNINGS STATEMENT

*with* https://www.dfas.mil/Portals/98/19-3_LES.pdf:

SAMPLE FORM

| Department of Defense | | 1. PAY PERIOD END 08/14/03 |
| CIVILIAN LEAVE AND EARNINGS STATEMENT | | 2. PAY DATE 12/05/03 |
| VISIT THE DFAS WEBSITE AT:  WWW.DFAS.MIL | | |

57.    The Military LES shows Greenwood's "GRADE" as "E7" as opposed to a "GS" level, which would be used for a civilian employee.

58.    The Military LES shows Greenwood's "BRANCH" as "ARMY." The Army National Guard is a branch of the U.S. Army.

59.    Grade E7 corresponds to Sergeant First Class in the U.S. Army, Reserves, and National Guard.

60.    The Military LES shows that Plaintiff has a "PAY DATE" of 010726. The "PAY DATE" is the date the member entered active duty for pay purposes, expressed in YYMMDD format. Thus, the LES indicates that Greenwood entered active duty for pay purposes on July 26, 2001.

61.    The Military LES also shows that Greenwood has a "DIEMS" of 010726. "DIEMS" stands for "Date Initially Entered Military Service," and is used to indicate which retirement plan the member is under and expressed in YYMMDD format. Thus, the Military LES indicates that Greenwood entered military service on July 26, 2001, the same date as the date Greenwood entered active duty for pay purposes.

62.    The Military LES also shows that Greenwood had, as of February 2020, 18 Years of Service and an ETS of 230725. ETS stands for "Expiration of Term of Service," which is synonymous with the End of Active Service, End of Active Obligated Service, or Expiration of Active Obligated Service, and the number refers to July 25, 2023, 22 years after the date Greenwood first entered active duty for pay purposes and the date Greenwood initially entered military service for retirement plan purposes.

63.    The Military LES shows BAS in the amount of $372.71.

64.    BAS is an acronym for "Basic Allowance for Subsistence," which is "meant to offset costs for a member's meals," and is "based in the historic origins of the military in which the military provided room and board (or rations) as part of a member's pay." The 2020 BAS

rate        for        enlisted        members        was        $372.71.        *See* https://militarypay.defense.gov/PAY/Allowances/bas.aspx.

65.     The Military LES also shows "BAH" in the amount of $2,442, which the Military LES states is based on zip code 53144. That zip code corresponds to the Military Recruiting office in the Kenosha National Guard Armory, 4200 43rd Ave, Kenosha, WI 53144, from which Greenwood worked.

66.     BAH is an acronym for "Basic Allowance for Housing," which is "an allowance to offset the cost of housing when you do not receive government-provided housing." *See* https://militarypay.defense.gov/PAY/Allowances/bah.aspx.

67.     Only active-duty members and reserve component members serving on U.S. Code Title 10, Title 14 or Title 32 orders receive BAH and BAS benefits.  *See* Maj. Heidi M. Steele, "Making the Most Out of Your Pay and Allowances: Military Income and Tax-Free Benefits," 2016        Army        Law.        37,        39        (October        2016)        (available        at https://tjaglcspublic.army.mil/documents/27431/576488/2016-October-Steele-Tax+Free+Benefits.pdf/949ae749-fb2e-4bc6-a2b9-d870ec4a154b.

68.     Greenwood's Military LES would not include BAH and BAS benefits if she were not on active duty or a reserve component member serving on U.S. Code Title 10, Title 14, or Title 32 orders.

69.     On February 21, 2020, Greenwood was serving under Title 32 orders.

70.     The bottom-right corner of the LES also identifies the DFAS website: "WWW.DFAS.MIL."

71.     A copy of a "New Customer Cash Advance Approval Report" and Voided Check Advice dated February 21, 2020, which indicate that Greenwood was "approved for ACH loan"

with an "Installment Cash Advance (ACH)" based in part on her being employed as a "RECRUITER" by DFAS and that a transaction in the amount of $2,700 between Cottonwood and Greenwood occurred on February 21, 2020 is attached to this complaint as Exhibit F.

72.     Cottonwood was also aware that Greenwood was recently divorced and was using a different name.

73.     As part of Greenwood's loan application materials, Greenwood provided her Wisconsin driver's license to a Cottonwood employee, who made a photocopy of it.

74.     Greenwood's driver's license at the time identified Greenwood by her married name: "Jamie Lynn Armstrong."

75.     Exhibit C confirms that Cottonwood obtained and reviewed a copy of Plaintiff's driver license on February 21, 2020.

76.     Exhibit C also confirms that Greenwood executed a Cottonwood form "Affidavit One and the Same Person" certifying that Jamie Lynn Greenwood and Jamie Lynn Armstrong (the name which appeared on her driver's license issued on October 17, 2017) "are one and the same person."  A copy of the driver's license, form affidavit, and divorce decree order dated November 27, 2018 awarding Greenwood the right to use her former legal surname, are included in documents produced by Cottonwood in discovery during the Small Claims Collection Action and are attached to this complaint as Exhibit G.

77.     Further, after the loan was originated but before Cottonwood filed the Small Claims Collection Action, Greenwood provided Cottonwood with additional information showing that she was a servicemember on active duty or AGR duty.

78.     At the time, Greenwood was having a difficult time making payments because her basement had flooded, causing approximately $25,000 in damage for which her insurer had not reimbursed her.

79.     Sometime in July or August of 2020, Greenwood had multiple telephone conversations with "Ron," a Cottonwood employee who frequently called Greenwood about payments on the loan.

80.     In at least two conversations with Ron, Greenwood requested a reduction in the interest rate of the loan based upon Greenwood's research into the Servicemembers Civil Relief Act, which she had done a few weeks after obtaining the loan.

81.     Ron stated that there was no way to change the interest rate on the loan and said that Greenwood should pay whatever she could but at the current loan terms.

**B.     The Loan Agreement that Gave Rise to the Small Claims Collection Action Was Void Ab Initio Because It Violated the MLA.**

82.     The Loan Agreement states that, pursuant to the terms of the loan, interest would accrue at an Annual Percentage Rate ("APR") of 520.00%.

83.     The Loan Agreement also contains a provision that purports to require the consumer to submit disputes to mandatory and binding arbitration.

84.     The Loan Agreement contemplates "consumer credit" as defined in the MLA because it was the right to incur or defer payment of a debt that was subject to a finance charge or payable in more than four installments, and was extended for personal, family, or household purposes.

85.     The MLA, 10 U.S.C. § 987(a) provides, in part:

> **(a)    Interest.**  A creditor who extends consumer credit to a covered member of the armed forces or a dependent of such a member shall

15

not require the member or dependent to pay interest with respect to the extension of such credit, except as—

**(1)**    agreed to under the terms of the credit agreement or promissory note;

**(2)**    authorized by applicable State or Federal law; and

**(3)**    not specifically prohibited by this section.

**(b)**    **Annual percentage rate.**  A creditor described in subsection (a) may not impose an annual percentage rate of interest greater than 36 percent with respect to the consumer credit extended to a covered member or a dependent of a covered member.

…

**(e)**    **Limitations.**  It shall be unlawful for any creditor to extend consumer credit to a covered member or a dependent of such a member with respect to which—

…

**(3)**    the creditor requires the borrower to submit to arbitration or imposes onerous legal notice provisions in the case of a dispute.

86.    At the time Greenwood allegedly became obligated on the Loan Agreement with Cottonwood, Greenwood was a "covered member" because she was serving on active duty under a call or order that does not specify a period of 30 days or fewer or on Active Guard and Reserve Duty.

87.    Greenwood was still a "covered member" as of the date the Small Claims Collection Complaint was filed.

88.    At the time Greenwood applied for the loan at issue in this action, Cottonwood knew or should have known that Greenwood was a covered borrower.

89.    As described above, numerous documents that Greenwood provided along with the loan application and which are reproduced as exhibits attached to this complaint

16

unequivocally indicated that Greenwood was on active Guard and Reserve Duty with the Army National Guard when she obtained credit from Cottonwood.

90.    As described above, Greenwood also told Cottonwood on several occasions both before and after credit was extended that she was a member of the Army National Guard on active duty or active Guard and Reserve duty.

91.    The New Customer Checklist and Customer Information Sheet in Exhibit C showed that Plaintiff is a "RECRUITER" employed by DFAS.

92.    The Landmark checking account statement in Exhibit D expressly linked Greenwood's direct deposit earnings income from DFAS to her status as an "ACTIVE" member of the "ARMY."

93.    The Military LES (Exhibit E) showed that Greenwood's "BRANCH" was "ARMY," that her "GRADE" was "E7" (a military rank), provided information about her term of active service, including that she had approximately 18 years of service with an anticipated end date in July 2023, and that Greenwood was receiving Basic Allowance for Subsistence and Basic Allowance for Housing payments.

94.    Thus, at the time the loan was issued Cottonwood had numerous pieces of evidence indicating that Greenwood was a "covered member" under the MLA.

95.    The MLA puts the burden on the creditor to correctly determine whether the consumer is a "covered member" under the MLA and adjust the terms of any credit extended accordingly.

96.    Moreover, Greenwood's status as a "covered member" is accurately reflected in her consumer report.  Attached to this Complaint as Exhibit H is a copy of a consumer report that

Greenwood obtained from Experian, a consumer reporting agency that complies and maintains files on consumers on a nationwide basis.

97.     Exhibit H states:



98.     Exhibit H also states:

99.     Upon information and belief, Cottonwood did not verify Greenwood's MLA status from the MLA database at the time of the transaction.

100.    Upon information and belief, Cottonwood did not verify Greenwood's MLA status by using a statement, code or similar indicator describing Greenwood as not being active-duty military or Active Guard and Reserve status at the time of the transaction.

101.    In connection with the Small Claims Collection Act, Cottonwood produced in discovery a Status Report Pursuant to Military Lending Act, obtained from the Department of Defense Manpower Data Center (the "MLA Status Report").  A copy of the MLA Status Report is attached to this complaint as Exhibit I.

102.    Exhibit I states:

| | |
|---|---|
| SSN: | XXX-XX |
| Birth Date: | . |
| Last Name: | GREENWOOD |
| First Name: | JAMIE |
| Middle Name: | L |
| Status As Of: | Feb-24-2020 |

103.    32 C.F.R. § 232.5(b) states, in part:

**(2)    Methods to check status of consumer –**

    **(i)    *Department database -***

        **(A)    *In general.*** To determine whether a consumer is a covered borrower, a creditor may verify the status of a consumer by using information relating to that consumer, if any, obtained directly or indirectly from the database maintained by the Department, available at *https://www.dmdc.osd.mil/mla/welcome.xthml*. A search of the Department's database requires the entry of the consumer's last name, date of birth, and Social Security Number.

        **(B)    *Historic lookback prohibited.*** At any time after a consumer has entered into a transaction or established an account involving an extension of credit, a creditor (including an assignee) may not, directly or directly, obtain any information from any database maintained by the Department to ascertain whether a consumer had been a covered borrower as of the date of that transaction or as of the date that account was established.

19

104. The MLA User Guide instructs:

The Department of Defense (DoD) strongly supports the enforcement of the Military Lending Act. Information provided is in support of Title 10 and a part of Title 14 for Army, Navy, marine Corps, Air Force, National Oceanic and Atmospheric Administration (NOAA), Public Health and Coast Guard. The data is extracted from DMDC's Defense Eligibility and Enrollment Reporting System (DEERS) database, which is the official source of data regarding eligibility for uniformed services medical care and other benefits and entitlements.

DMDC has issued thousands of "does not possess any information indicating that the individual is currently on active duty" responses and has experienced a very small error rate. Nevertheless, if you receive the above response and a Servicemember, family member, friend, or representative asserts that the individual is on active duty status, or is otherwise entitled to the protections of the MLA, you are strongly encouraged to obtain further verification of the person's status by contacting the associated service[.]

105. Not only did Cottonwood not perform a query based on Greenwood's former last name ("Armstrong"), but the MLA Status Report in <u>Exhibit I</u> states that it purports to provide Greenwood's MLA's "Status As Of" February 24, 2020, three days *after* Greenwood entered into a transaction or established an account with Cottonwood.

106. Cottonwood was not entitled to rely on the MLA Status Report, which was not created until after Greenwood entered into the loan with Cottonwood. *See* 32 C.F.R. § 232.5(b)(2)(i)(B).

107. A creditor cannot rely on an MLA Status Report that is obtained after the loan was issued because any loan that violates the MLA is *void ab initio*, and thus the MLA violation cannot be "cured" by the creditor rescinding the transaction or adjusting the terms of an illegal loan after-the-fact. The MLA, 10 U.S.C. § 987(f)(3), provides:

**(f)    Penalties and remedies.**

…

**(3)** Contract void.  Any credit agreement, promissory note, or other contract prohibited under this section, is void from the inception of such contract.

**(4)** Arbitration.  Notwithstanding section 2 of title 9, or any other Federal or State law, rule, or regulation, no agreement to arbitrate any dispute involving the extension of consumer credit shall be enforceable against any covered member or dependent of such a member, or any person who was a covered member or dependent of that member when the agreement was made.

108.    Because the Loan Agreement contemplated interest at a rate higher than allowed by the MLA, it was void from its inception.

109.    Because the Loan Agreement included a provision purporting to require borrowers to resolve claims through mandatory and binding arbitration, it was void from its inception.

110.    Because the Loan Agreement was void, Cottonwood's attempts to collect thereon, including Cottonwood's attempts to collect thereon through the Small Claims Collection Action, were unlawful.

111.    Upon information and belief, the Loan Agreement is a standard form document that Cottonwood uses according to policies and procedures standardized for extending credit to consumers in Wisconsin.  *See Wis. Auto Title Loans v. Jones*, 2006 WI 53, ¶¶ 47-48, 290 Wis. 2d 514, 552-53, 714 N.W.2d 155, 174 (2006).

112.    Upon information and belief, the Loan Agreement contains Wisconsin-specific modifications but is otherwise generally consistent with a standard form loan agreement that Cottonwood Financial uses to extend credit to consumers throughout the United States, as modified for each state in which Cottonwood Financial or one of its affiliates operates.

113.    Upon information and belief, Cottonwood employed a standardized practice or procedure in determining (or failing to determine) whether Greenwood was a covered member,

which Cottonwood employed as a matter of course for consumers in Wisconsin and throughout the United States.

114.    Upon information and belief, the practice and procedures that Cottonwood employs in determining whether to issue credit to consumers and, if so, the amount and terms of such credit, are prescribed by Cottonwood Financial, and Cottonwood Financial directs its lending subsidiaries throughout the United States to employ the same practices and procedures. Indeed, the "Affidavit One and the Same Person" in Exhibit G is a form prepared by "Cottonwood Financial Administrative Services, LLC" and Exhibit H states that "THE CASH STORE BY CFAS" obtained Greenwood's credit information from Experian on numerous occasions (including February 21, 2020). Upon information and belief, Cottonwood Financial acts through its subsidiary Cottonwood Financial Administrative Services, LLC in establishing and maintaining loan processing and origination protocols for Cottonwood Financial subsidiaries located throughout the U.S.

115.    Upon information and belief, Cottonwood has issued numerous loans to other covered borrowers in Wisconsin and throughout the United States that were inconsistent with the requirements of the MLA.

116.    Upon information and belief, Cottonwood has collected payments from and sued numerous covered borrowers in Wisconsin and throughout the United States notwithstanding the fact that the underlying loans were inconsistent with the requirements of the MLA.

### *The MLA*

117.    Congress adopted the MLA to ensure that active-duty members of the military and their dependents were adequately protected from predatory lending practices. The protections in the MLA are self-executing: the MLA renders void from inception any credit

agreement or other contract with a covered member that contains provisions that are prohibited by the MLA.  10 U.S.C. § 987(f)(3).

118.    Violations of the MLA are also punishable as misdemeanors, and to further its statutory purpose of protecting covered members from predatory lending practices, Congress created a private right of action against any person who violates the MLA for civil liability, including actual damages, punitive damages, equitable or declaratory relief, costs, and attorney's fees, in addition to any other remedies that may be available under the law.  10 U.S.C. § 987(f)(1), (2), and (5).  Further, the civil liability provisions in the MLA are strict liability, with the exception that the MLA provides a "bona fide error" affirmative defense from civil liability where a defendant shows that a violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid such errors.

119.    In adopting the National Defense Authorization Act for Fiscal Year 2006, Congress instructed the Department of Defense to submit a report on various aspects of predatory lending practices directed at members of the Armed Forces and their families.

120.    Consistent with this instruction the Department of Defense issued its report. Department of Defense, *Report on Predatory Lending Practices Directed at Members of the Armed Forces and Their Dependents* (Aug. 9, 2006) (available online: http://archive.defense.gov/pubs/pdfs/Report_to_Congress_final.pdf) (the "2006 Predatory Lending Practices Report").

121.    The 2006 Predatory Lending Practices Report found:

Predatory lending practices are prevalent and target military personnel, either through proximity and prevalence around military installations, or through the use of affinity marketing techniques, particularly on-line.

122.    The 2006 Predatory Lending Practices Report further found that:

[P]redatory lending undermines military readiness, harms the morale of troops and their families, and adds to the cost of fielding an all volunteer fighting force. Education, counseling, assistance from Aid Societies, and sound alternatives are necessary but not sufficient to protect Service members from predatory lending practices or products that are aggressively marketed to consumers in general and to military personnel directly.

123.    Because education, counseling, assistance from Aid Societies, and sound alternatives were "not sufficient" to protect Service members from predatory lending practices or products that are aggressively marketed to consumers in general and to military personnel directly, the 2006 Predatory Lending Practices Report urged Congress to adopt the following protections:

a.    Require that unambiguous and uniform price disclosures be given to all Service members and family members with regard to any extension of credit (excluding mortgage lending;

b.    Require a federal ceiling on the cost of credit to military borrowers, capping the APR to prevent any lenders from imposing usurious rates;

c.    Prohibit lenders from extending credit to Service members and family members without due regard for the Service member's ability to repay;

d.    Prohibit provisions in loan contracts that require Service members and family members to waive their rights to take legal action;

e.    Prohibit contract clauses that require Service members to waive any special legal protections afforded to them; and

f.    Prohibit states from discriminating against Service members and family members stationed within their borders, and prohibit lenders from making loans to Service members that violate consumer protections of the state in which their base is located.

124.    In response to the 2006 Predatory Lending Practices Report, Congress enacted the MLA, which, among other things, prohibits extensions of consumer credit to covered members

that impose an annual percentage rate of interest greater than 36 percent.  10 U.S.C. § 987(a)-(b), (e).

125.    The MLA further directs the Secretary of Defense to prescribe regulations to "carry out" the MLA.  *See* 10 U.S.C. § 987(h).  These regulations are promulgated at 32 C.F.R. § 232 *et seq.*

126.    When the Department of Defense first adopted its MLA regulations in 2007, the regulations provided, among other things:

> (i)    a narrow definition of "consumer credit" that limited the scope of the MLA to payday loans, vehicle title loans, and tax refund anticipation loans; and
>
> (ii)    that creditors could rely on the consumer "self-certifying" that they were not a covered member as a "safe harbor" for determining that the loan need not be subject to the MLA's requirements (including the interest rate cap).

127.    In 2013, the Department of Defense issued an Advanced Notice of Proposed Rulemaking regarding proposed changes to some of the MLA regulations in order to further its statutory purposes, including:

> (i)    the expansion of the definition of "consumer credit" to become consistent with the scope of the federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), because the "extremely narrow definition of 'consumer credit' permit[ted] creditors to structure credit products in order to reduce or avoid altogether the obligation of the MLA"; and
>
> (ii)    the elimination of the "safe harbor" provision based on the borrower's "self-certification" because the Department of Defense had "become aware of misuses of the covered borrower identification statement whereby a Service member (or covered dependent) falsely declares that he or she is not a covered borrower."

128.    Thus, under the new scheme, the creditor bears the burden of determining whether a consumer is a "covered borrower" and must satisfy this burden before issuing the loan, and

cannot do so by simply asking the borrower to "self-certify" their status. *See Huntco Pawn Holdings, LLC v. United States DOD*, 240 F. Supp. 3d 206, 224 n.9 (D.D.C. 2016). Instead, the creditor may rely on a "safe harbor" only if it has verified the consumer's MLA status based on information that it obtains before issuing the loan that affirmatively confirms that the consumer *is not* active-duty military. *See* 32 C.F.R. § 232.5(b).

129.    Moreover, because the protections in the MLA are self-executing, any "safe harbor" under 32 C.F.R. § 232.5(b) does not reinstate any loan that was void from its inception and certainly does not entitle a creditor to collect interest at an annual percentage rate greater than 36%. *See* "Limitations on Terms of Consumer Credit Extended to Service Members and Dependents," 79 FR 58602, 58615 (Sept. 24, 2014); *see also Huntco Pawn Holdings, LLC v. United States DOD*, 240 F Supp. 3d 206, 214 (D.D.C. 2016) (quoting 79 FR 58602, 58615).

### *The WCA*

130.    The Wisconsin Consumer Act ("WCA") was enacted to protect consumers against unfair, deceptive, and unconscionable business practices and to encourage development of fair and economically sound practices in consumer transactions. Wis. Stat. § 421.102(2).

131.    To carry out this intent, the WCA provides Wisconsin consumers with an array of protections and legal remedies, and instructs that these protections must be "liberally construed and applied" in order "to induce compliance with the WCA and thereby promote its underlying objectives." Wis. Stat. §§ 421.102(1), 425.301; *First Wisconsin Nat'l Bank v. Nicolaou*, 113 Wis. 2d 524, 533, 335 N.W.2d 390 (1983).

132.    To further the objectives underlying the WCA, the Wisconsin legislature has empowered the Wisconsin Department of Financial Institutions and the Wisconsin Department of Justice to bring actions against any person who violates the WCA, and has further provided

Wisconsin consumers with an array of protections and legal remedies, including a private cause of action to temporarily or permanently enjoin conduct that violates the WCA or the federal consumer credit protection act and recover classwide statutory, actual, and punitive damages on behalf of all consumers who suffer similar injuries. Where a consumer seeks injunctive or declaratory relief, the WCA provides that "it shall not be a defense to an action brought under this section that there exists an adequate remedy at law." *See* Wis. Stats. §§ 421.102(1), 425.301, 425.401, 426.109(1), 426.110(1); 426.110(4)(e), 426.301.

133.    The private cause of action is essential to deterring violations and furthering the WCA's underlying objectives:

> The provisions of the WCA for private enforcement through the use of civil legal remedies by the individual consumer are some of the most important sections of the Act. The function of private enforcement is both to secure the rights of the individual and simultaneously to assist public authorities in achieving compliance for the ultimate benefit of all consumers.

Thomas D. Crandall, "Wisconsin Consumer Credit Laws Before and After the Consumer Act," 1973 Wis. L. Rev. 334, 376-77.

134.    Thus, private actions under the WCA benefit not only consumers whose rights have been violated and competitors of the violators, whose competitive advantage should not be diminished because of their compliance with the law, but also the public authorities and the public generally, who would otherwise be burdened with the costs of using public resources to achieve compliance.

135.    Consumers' WCA claims under Wis. Stat. § 427.104(1) are analyzed using the same methods as claims under the FDCPA. Indeed, the WCA itself requires that the court analyze the WCA "in accordance with the policies underlying a federal consumer credit protection act," including the FDCPA. Wis. Stat. § 421.102(1).

136.    Further, the Wisconsin Supreme Court has held that WCA claims relating to debt collection to be analyzed under the "unsophisticated consumer" standard. *Brunton v. Nuvell Credit Corp.*, 785 N.W.2d 302, 314-15. In *Brunton*, the Wisconsin Supreme Court explicitly adopted and followed the "unsophisticated consumer" standard, citing and discussing *Gammon v. GC Servs. Ltd. P'ship*, 27 F.3d 1254, 1257 (7th Cir. 1994). *Id.*

137.    Wis. Stat. § 421.108 provide: "Every agreement or duty within chs. 421 to 427 imposes an obligation of good faith in its performance or enforcement. 'Good faith" means honesty in fact in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing."

138.    Wis. Stat. § 426.110 provides, in relevant part:

(1)    [A]ny customer affected by a violation of chs. 421 to 427 and 429 or of the rules promulgated pursuant thereto or by a violation of the federal consumer credit protection act, or by conduct of a kind described in sub. (2), may bring a civil action on behalf of himself or herself and all persons similarly situated, for actual damages by reason of such conduct or violation, together with penalties as provided in sub. (14), reasonable attorney fees and other relief to which such persons are entitled under chs. 421 to 427 and 429. [...]

139.    Wis. Stat. § 425.302 creates a cause of action for "all violations for which no other remedy is specifically provided" by the WCA.

140.    Wis. Stat. § 421.108 requires that every consumer transaction under the WCA "imposes an obligation of good faith in its performance or enforcement," including "honesty in fact in the conduct or transaction concerned and the observance of reasonable commercial standards of fair dealing."

141.    Wis. Stat. § 427.104(1)(g) states that a debt collector may not: "Communicate with the customer … in such a manner as can reasonably be expected to threaten or harass the customer."

142.    Wis. Stat. § 427.104(1)(h) states that a debt collector may not: "Engage in other conduct which can reasonably be expected to threaten or harass the customer …."

143.    Wis. Stat. § 427.104(1)(j) states that a debt collector may not: "Claim, or attempt or threaten to enforce a right with knowledge or reason to know that the right does not exist."

144.    Wis. Stat. § 427.104(1)(L) states that a debt collector may not: "Threaten action against the customer unless like action is taken in regular course or is intended with respect to the particular debt."

## COUNT I – MLA

145.    Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

146.    Plaintiff was a covered borrower when the parties entered into the Loan Agreement.

147.    Plaintiff remained a covered member at all times between the date the parties entered into the Loan Agreement and April 14, 2021, when Greenwood became part-time.

148.    The Loan Agreement required repayment at an annual percentage rate of interest of 520.00%.

149.    The Loan Agreement purported to require the consumer to submit disputes to mandatory and binding arbitration.

150.    The Loan Agreement was void from its inception because it violated the MLA.

151.    Defendants filed the Small Claims Collection Action to enforce a loan agreement that was void from its inception.

152.    Defendants had actual or constructive knowledge that Greenwood was a servicemember when Defendants filed the Small Claims Collection Action.

153. Defendants had actual or constructive knowledge that Greenwood was a covered member when Defendants filed the Small Claims Collection Action.

154. Defendants had actual or constructive knowledge that Greenwood was a covered borrower when Defendants filed the Small Claims Collection Action.

155. Defendants knowingly and willfully disregarded copious evidence in Defendants' possession, custody, and control that Plaintiff was a covered borrower and covered member when Defendants filed the Small Claims Collection Action.

156. Defendants violated 10 U.S.C. §§ 987(a), 987(b), and 987(e)(3).

## COUNT II – WCA

157. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

158. Count II is brought against Defendants Cottonwood Financial and CF-WI.

159. Defendants filed the Small Claims Collection Action against Plaintiff in order to collect an alleged debt purportedly arising from the Loan Agreement.

160. The Loan Agreement required repayment at an annual percentage rate of interest of 520.00%.

161. The Loan Agreement purported to require the consumer to submit disputes to mandatory and binding arbitration.

162. The Loan Agreement was void from its inception because it violated the MLA.

163. The subject of the Small Claims Collection Action was an illegitimate debt because the Loan Agreement was void from its inception.

164. Defendants violated Wis. Stat. §§ 421.108, 427.104(g), 427.104(h), 427.104(j), and 427.104(L).

## CLASS ALLEGATIONS

a.  Plaintiff brings this action on behalf of two Classes.

165.    Class I ("Nationwide Class"), consists of:

(a) all persons, who, (b) between October 5, 2016 and October 5, 2021 (c) entered into, rolled over, renewed, refinanced, or consolidated a loan by any means with a Cottonwood Defendant that (d) imposed an annual percentage rate of greater than 36 percent or contained a provision purporting to require disputes be submitted to mandatory binding arbitration, (e) and who submitted to the Cottonwood Defendant a Military Leave and Earnings Statement as proof of income when applying for said loan.

166.    Plaintiff also brings this action on behalf of a Wisconsin Subclass, consisting of all members of the Class who resided in the State of Wisconsin when they obtained credit from Cottonwood.

167.    The Class and Subclass is each so numerous that joinder is impracticable.  Upon information and belief, there are more than 50 members of the Class and Subclass.

168.    There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. The predominant common questions relate to whether Defendants complied with the MLA and/or the WCA, and the remedies that should be available to class members in the event they did not.

169.    Plaintiff's claims are typical of the claims of the Class members.  All are based on the same factual and legal theories.

170.    Plaintiff will fairly and adequately represent the interests of the Class members. Plaintiff has retained counsel experienced in consumer credit and debt collection abuse cases.

171.    Prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants.

172.    Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

173.    A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible.

## JURY DEMAND

174.    Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court enter judgment in favor of Plaintiff and the Class and against Defendant for:

(a)    declaratory relief;

(b)    injunctive relief;

(c)    actual damages;

(d)    disgorgement;

(e)    statutory damages;

(f)    punitive damages;

(g)    attorneys' fees, litigation expenses, and costs of suit; and

(h)    such other or further relief as the Court deems proper.

Dated:  October 6, 2021

**ADEMI LLP**

By:    /s/ John D. Blythin
       John D. Blythin (Wis. SBN 1046105)
       Jesse Fruchter (Wis. SBN 1097673)
       3620 East Layton Avenue
       Cudahy, WI 53110
       (414) 482-8000
       (414) 482-8001 (fax)
       jblythin@ademilaw.com
       jfruchter@ademilaw.com